UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| JOSEPH COLLINS and SHAWN BURKHART, as personal representatives and next of kin of JOSEPH LOU COLLINS BURKHART, deceased, | ) ) ) ) ) |
| Plaintiffs, | ) 3:22-CV-358-KAC-JEM ) |
| v. | ) ) |
| CLAIBORNE COUNTY, TENNESSEE, | ) ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

This action is before the Court on Defendant Claiborne County, Tennessee's "Motion for Summary Judgment" [Doc. 35]. Plaintiffs Joseph Collins and Shawn Burkhart; as personal representatives and next of kin of Joseph Lou Collins Burkhart, deceased; brought a claim against Defendant for failure to provide adequate medical care, in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment [*See* Doc. 33 at 1]. For the reasons below, the Court grants Defendant's Motion for Summary Judgment in part and denies it in part. Plaintiffs' failure to train theory of liability survives summary judgment.

**I.    Background**[1]

Defendant Claiborne County, Tennessee is a municipal county government that operates the Claiborne County Jail ("the Jail") [*See* Doc. 35-1 at 1-4 (Declaration of Robert Sexton ("Sexton Decl.") ¶¶ 2-3)]. The Jail accepts arrestees from the New Tazewell police department

---

[1] Because Plaintiffs are the nonmoving Parties, the Court describes the facts in the light most favorable to them. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

[*See* Doc. 47-8 at 21 (Deposition of Nikki Suttles ("Suttles Dep.") 81:1-13)]. On October 10, 2021, Joseph Lou Collins Burkhart ("Mr. Burkhart") died of an overdose in the Jail [*See* Docs. 35-2 at 3 (Declaration of Colten Hunter ("Hunter Decl.") ¶ 22), 47-1 at 15 (Deposition of Robert Sexton ("Sexton Dep.") 57:14-15 (noting that Mr. Burkhart died because of an "overdose")), 47-2 at 4, 5 (Deposition of Colten Hunter ("Hunter Dep.") 12:25-13:1, 16:11-18)].

Viewing the facts in the light most favorable to Plaintiffs, Defendant provided basic training to Jail correctional officers [*See* Doc. 47-1 at 3 (Sexton Dep. 7:20-9:9)]. It included "things like CPR" and "in-service trainings" [Doc. 47-2 at 3 (Hunter Dep. 8:12-13)]. Defendant also provided instruction from the Tennessee Correctional Institute ("TCI") [Doc. 47-1 at 3 (Sexton Dep. 7:20-9:9)]. The correctional officers involved in this case completed "all the training required by" TCI [*See* Doc. 35-3 at 1-2 (Declaration of Nikki Suttles ("Suttles Decl.") ¶ 3)].

At intake, Defendant's policies required an officer to conduct a medical screen of a detainee where the officer "ask[s] . . . [the detainee] a series of medical questions" from a form [*See* Doc. 47-8 at 24-25 (Suttles Dep. 92:19-94:25); *see also* Doc. 35-3 at 5-8 (Claiborne County Jail Policies and Procedures)]. The officer was to "observe the arrestee visually for obvious signs of injury or illness" and "<u>refuse to accept the inmate</u>" if he or she was "in need of immediate emergency medical or mental attention," instead referring the inmate to an appropriate facility for medical attention [Doc. 35-3 at 5-8 (Claiborne County Jail Policies and Procedures at 1-2)]. That determination was "left to the discretion of the" officer at intake [Doc. 47-8 at 24 (Suttles Dep. 93:1-23); *see also* Doc. 35-3 at 6 (Claiborne County Jail Policies and Procedures at 2)].

Once intake was complete, if an arrestee displayed signs of a medical condition, officers were taught "to contact medical staff [present at the Jail] to evaluate" the arrestee [Doc. 35-1 at 3 (Sexton Decl. ¶ 16)]. "If an intoxicated person is having some medical issue," officers were trained

2

"to contact medical staff" [Doc. 35-3 at 4 (Suttles Decl. ¶ 10)]. But if an arrestee was merely drunk and not "falling down, vomiting, appear[ing] ill, or having some other problem," officers were taught to place him or her in a "cell to sleep it off" [*See* Doc. 35-1 at 3 (Sexton Decl. ¶ 16)].

Defendant did not "provide[] specific training to correctional officers on" identifying or "relating to drug . . . [or alcohol] overdoses" [Doc. 35-3 at 4 (Suttles Decl. ¶ 11)]. Officers were not trained "with respect to identifying the signs and symptoms of [an] opioid overdose" [Doc. 47-8 at 9 (Suttles Dep. 30:23-31:7, 32:23-33:1)]. And they were not trained on how "to determine whether or not someone was suffering from an opioid overdose," as "opposed to" simply "being intoxicated" [Doc. 47-2 at 12 (Hunter Dep. 43:1-4)].

So, Defendant trained officers "to look for any signs of obvious injury or illness," and "left to the discretion of the officers . . . [the decision] as to whether or not that person requires a medical evaluation" [Doc. 35-5 at 3 (Deposition of Nikki Suttles ("Suttles Dep.") 93:13-23)]. Tammy Regan, the Jail Administrator at the relevant time, described this discretion as a "[j]udgment call" made by the officers [Doc. 47-3 at 13 (Deposition of Tammy Regan ("Regan Dep.") 51:9-25)]. But viewing the facts in the light most favorable to Plaintiffs, the officers "really don't have any medical training" that would allow them to make this judgment call [*See id.* at 7 (Regan Dep. 27:1-28:3)]. Officers were not trained on medical issues [*See* Doc. 47-8 at 3 (Suttles Dep. 6:21-8:7:25)]. The main training provided was "to go over a booking process that has medical questions . . . there's no training involved as far as medical" [*Id.* at 3, 19 (Suttles Dep. 7:15-25; 72:21-73:4)].

Jail policies and procedures required officers to observe certain inmates at irregular intervals [*See* Doc. 47-8 at 25 (Suttles Dep. 96:14-97:24); *see also* Doc. 35-3 at 6 (Claiborne County Jail Policies and Procedures at 2)]. The written policy and procedures required correctional officers to "[o]bserve inmates confined in a holding cell or detoxication cell at irregular intervals

3

about every 15 minutes" [*See* Doc. 35-3 at 6 (Claiborne County Jail Policies and Procedures at 2)]. But the actual practice at the Jail was that officers checked arrestees with a medical condition or who were suicidal "about every 15 minutes," while officers checked solely intoxicated arrestees approximately "[o]nce an hour" [*See* Doc. 47-8 at 25 (Suttles Dep. 96:16-97:9) *see also* Docs. 35-3 at 2 (Suttles Decl. ¶¶ 8-9), 47-3 at 6 (Reagan Dep. 23:8-24:15), 47-2 at 6 (Hunter Dep. 20:3-17)]. Officers could place an arrestee in cell D1 (the "drunk tank") in the booking area to "keep a closer eye" on the arrestee [*See* Doc. 47-1 at 7 (Sexton Dep. 24:6-25:7)].

Officers were required to log their checks on arrestees [*See* Doc. 47-8 at 25 (Suttles Dep. 97:10-24)]. Checks were logged on the life check system [*Id.* at 25-26 (Suttles Dep. 97:22-98:6)]. To perform a check, an officer looked into the cell to ensure "there's a living, breathing body in there" [*See* Docs. 47-1 at 9, 10, 12 (Sexton Dep. 31:5-32:1; 35:21-36:1; 43:14-44:7); 35-1 at 3 (Sexton Decl. ¶ 17)]. If the officer is satisfied, he or she scans the bar code for that cell and marks the location "clear," which creates a digital record [Doc. 47-8 at 25-26 (Suttles Dep. 97:22-98:6); *see also* Docs. 35-3 at 2 (Suttles Decl. ¶¶ 4-6), 35-1 at 3 (Sexton Decl. ¶ 17), 47-1 at 9, 10, 12 (Sexton Dep. 31:5-32:1; 35:21-36:1; 43:14-44:7)].

On October 9, 2021, Officer Russell Ruszkowski with the New Tazewell police department arrested Mr. Burkhart and transported him to the Jail [*See* Doc. 35-4 at 1-2 (Declaration of Russell Ruszkowski ("Ruszkowski Decl.") ¶¶ 2-13)]. Officer Ruszkowski discovered Mr. Burkhart "passed out in the door of his vehicle" [*Id.* at 2 (Ruszkowski Decl. ¶ 5)]. Mr. Burkhart admitted to "drinking alcohol" but "denied ingesting anything other than alcohol" [*See id.* at 2 (Ruszkowski Decl. ¶¶ 6, 7)]. At no time during the initial encounter, arrest, or transport did Officer Ruszkowski observe "anything that indicated" that Mr. Burkhart "had a medical problem that required" treatment [*See id.* at 2 (Ruszkowski Decl. ¶¶ 13-15)]. At approximately 8:56 p.m., Officer

4

Ruszkowski transferred custody of Mr. Burkhart to Officers Robert Sexton and Colten Hunter at the Jail [*See* Docs. 47-2 at 4 (Hunter Dep. 10:13-25), 35-1 at 1 (Sexton Decl. ¶¶ 3-4)].

Officers Sexton and Hunter began the intake process [*See* Docs. 47-2 at 4 (Hunter Dep. 10:13-25), 35-1 at 1 (Sexton Decl. ¶¶ 3-4)]. Officer Sexton searched Mr. Burkhart before he entered the Jail and found no contraband [*See* Doc. 35-1 at 2 (Sexton Decl. ¶ 8)]. Mr. Burkhart "walked into the jail without any need for assistance" [*Id.*]. Once inside, Mr. Burkhart showered and changed into a jail uniform on his own [*Id.* (Sexton Decl. ¶ 9)].

Officer Sexton asked Mr. Burkhart "all of the booking questions including the medical questions" on the form [*Id.*]. Officer Sexton asked Mr. Burkhart "if he had any medical problems, or if he's taking any medication for health issues or recently hospitalized or under a doctor's care" [*See* Doc. 47-2 at 4 (Hunter Dep. 10:13-25)]. Mr. Burkhart said "no" [*Id.* (Hunter Dep. 10:23)]. Officer Sexton also asked Mr. Burkhart "if he had taken any drugs;" again, Mr. Burkhart said "no" [*See* Docs. 47-2 at 4-5 (Hunter Dep. 13:22-14:1), 35-1 at 2 (Sexton Decl. ¶ 9)]. Officers Sexton and Hunter both perceived Mr. Burkhart as intoxicated but not so intoxicated that he required medical attention [*See* Docs. 35-1 at 2 (Sexton Decl. ¶¶ 6, 8-9, 15-16), 35-2 at 2 (Hunter Decl. ¶¶ 6, 8, 14-15)]. However, while Mr. Burkhart was making a phone call shortly thereafter, Officer Hunter noticed that Mr. Burkhart "seemed like he was getting a little more intoxicated" during the call [*See* Doc. 47-2 at 6 (Hunter Dep. 18:2-4)].

Officer Sexton took Mr. Burkhart to cell D1 with other arrestees [Doc. 35-2 at 2 (Sexton Decl. ¶¶ 12-13)]. Once inside, Mr. Burkhart talked with Officer Sexton about "mak[ing] bond" and going to high school together [*Id.* (Sexton Decl. ¶ 14); *see also* Doc. 35-2 at 2 (Hunter Decl. ¶ 14)]. At that point, Officer Sexton assessed that Mr. Burkhart was impaired but not so impaired that he required "medical watch" [*See* Doc. 47-1 at 7, 8 (Sexton Dep. 25:16-19, 26:19-21)].

5

Neither Officer observed Mr. Burkhart "falling down, vomiting, appear[ing] ill, or having some other problem" [*See* Docs. 35-1 at 3 (Sexton Decl. ¶ 16), 35-2 at 2-3 (Hunter Decl. ¶ 16)]. A nurse was on duty at the Jail, but neither Officer believed Mr. Burkhart required medical attention, so neither requested an examination [*Id.*].

From 9:31 p.m. that night until 1:27 a.m. the next morning, officers, including Officers Sexton and Hunter, performed at least six (6) checks on Mr. Burkhart's cell[2] [*See* Docs. 47-6 at 1, 10, 11; 35-3 at 2 (Suttles Decl. ¶ 5); *see also* Docs. 35-1 at 3 (Sexton Decl. ¶¶ 17-18), 35-2 at 2-3 (Hunter Decl. ¶¶ 17-18)]. Officer Hunter observed Mr. Burkhart "laying down at times, sitting up, and even talking" [*See* Doc. 47-2 at 4 (Hunter Dep. 11:11-17)]. During one of Officer Sexton's checks, Mr. Burkhart talked with him [*See* Doc. 47-1 at 8 (Sexton Dep. 27:24-30)]. Until 1:27 a.m., each check was "clear," indicating that "everything appeared fine in the cell" [*See* Docs. 47-6 at 1, 10, 11; 35-3 at 2 (Suttles Decl. ¶ 6)]. And no other arrestee in Mr. Burkhart's cell indicated that there were any issues with Mr. Burkhart [*See* Doc. 35-1 at 4 (Sexton Decl. ¶ 24)].

Officer Hunter performed the last check at 1:27 a.m. [*See* Docs. 47-6 at 1, 11; 35-2 at 3 (Hunter Decl. ¶ 18)]. He "did not notice anything amiss" and "thought" Mr. Burkhart was "sleeping" [Doc. 35-2 at 3 (Hunter Decl. ¶ 18)]. But "[a]round 1:30 a.m.," Officer Sexton looked into Mr. Burkhart's cell [*See* Doc. 35-1 at 3 (Sexton Decl. ¶¶ 18, 20)]. Mr. Burkhart's "leg was sticking out from under his blanket, and it looked discolored" [*Id.* (Sexton Decl. ¶ 20)]. Mr. Burkhart did not respond when Officer Sexton entered the cell [*Id.* at 3-4 (Sexton Decl. ¶ 21)].

---

[2] The record contains a Surveillance Video Footage Report from the Tennessee Bureau of Investigation [*See* Doc. 47-4]. Plaintiffs assert that the Report captures the only times that officers performed a check of Mr. Burkhart's cell [*See* Doc. 47 at 6-7]. But the information in the Report is limited, and the Report does not purport to identify every check that occurred on Mr. Burkhart during the relevant time frame [*See* Doc. 47-4]. Therefore, even viewing the facts in the light most favorable to Plaintiffs, the Surveillance Video Footage Report cannot be read that broadly.

6

Officer Sexton attempted to move Mr. Burkhart, but "his hand and arm were cold," his face "was bluish," "he was not breathing," and he "did not have a pulse" [*Id.*]. Officer Hunter promptly called his supervisor and "911 to get paramedics" [*Id.*]. Officer Sexton attempted to revive Mr. Burkhart [*See* Doc. 47-1 at 7 (Sexton Dep. 22:20-22)].

Officer Kenneth Ochoa, a deputy with the Claiborne County Sheriff's Department, "overheard" the Jail "requesting 911" and went to the Jail to assist [*See* Doc. 47-5 at 4 (Deposition of Kenneth Ochoa ("Ochoa Dep.") 10:23-11:10)]. He too attempted to revive Mr. Burkhart but could not file a pulse [*Id.* (Ochoa Dep. 11:13-12:6)]. Officer Ochoa did not believe CPR would work, but he administered Narcan [*Id.* (Ochoa Dep. 12:14-18)]. That failed [*See* Doc. 47-1 at 7 (Sexton Dep. 22:23-23:8)]. On October 10, 2021, Mr. Burkhart was declared dead, dying of an overdose [*See* Docs. 35-2 at 3 (Hunter Decl. ¶ 22), 47-1 at 15 (Sexton Dep. 57:14-15 (noting that Mr. Burkhart died of an "overdose")), 47-2 at 4, 5 (Hunter Dep. 12:25-13:1, 16:11-18)].

Plaintiffs filed suit. Their First Amended Complaint is operative [*See* Doc. 33]. Plaintiffs assert one claim against Defendant for failure to provide adequate medical care, in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment [*See* Doc. 33 ¶¶ 27-35]. That claim was initially based on three potentially viable stated theories of municipal liability: (1) official policy, (2) custom, and (3) failure to train [*See id.* ¶¶ 29-31]. Defendant filed a "Motion for Summary Judgment," arguing that neither Officer Hunter nor Officer Sexton committed a constitutional violation, allegedly shielding Defendant from liability, and that in any event, Defendant is not liable for any policy, custom, or failure to train [*See* Doc. 35]. Plaintiffs opposed, arguing that the two Officers acted unconstitutionally [Doc. 47 at 9-12]. And in any event, Defendant purportedly "recklessly failed to train" the Jail correctional "officers on how to determine if a detainee needs medical attention," especially as it relates to a drug overdose, and "[b]ecause of this lack of

7

training, and lack of policies," Mr. Burkhart was injured [Doc. 47 at 14, 12-15]. Defendant replied [Doc. 48]. Plaintiffs supplemented their response [Doc. 67].

II.     **Analysis**

Federal Rule of Civil Procedure 56 provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the facts in the light most favorable to the nonmoving parties and draws all reasonable inferences from those facts in their favor. *See Matsushita*, 475 U.S. at 587; *Nat'l Satellite Sports, Inc.*, 253 F.3d at 907. The moving party bear the burden of demonstrating that no genuine dispute of material fact exists. *See Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 323 (6th Cir. 2023) (citation omitted). If the moving party satisfies this burden, the nonmoving parties "must set forth specific facts showing that there is a genuine issue for trial." *See Zakora v. Chrisman*, 44 F.4th 452, 464 (6th Cir. 2022) (quotation omitted). "The Court does "not weigh the evidence or make credibility determinations." *See Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021). "A genuine issue for trial exists only when there is sufficient 'evidence on which the jury could reasonably find for'" the nonmoving parties. *See Nat'l Satellite Sports, Inc.*, 253 F.3d at 907 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 249 (1986)). A "genuine" dispute is one over specific facts "that might affect the outcome" of the case. *See Regions Bank v. Fletcher*, 67 F.4th 797, 802 (6th Cir. 2023) (citation and quotation omitted).

A municipality "cannot be liable under a theory of respondeat superior; it can only be held liable for 'its own wrongdoing.'" *See Helphenstine v. Lewis Cnty., Ky.*, 60 F.4th 305, 323 (6th Cir. 2023) (quoting *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 565 (6th Cir. 2018)). "A municipality may be held liable under one of four recognized theories: '(1) the existence of an illegal official

policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.'" *Id.* (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)).

The United States Court of Appeals for the Sixth Circuit has held that "it is proper to consider possible constitutional violations committed by a municipality *qua* municipality, even in the absence of a showing of a constitutional violation by any one individual officer." *See Grote v. Kenton Cnty., Ky.*, 85 F.4th 397, 414 (6th Cir. 2023). For example, a municipality may be liable "even if no individual officer violated the Constitution where constitutional harm has nonetheless 'been inflicted upon the victim' and the municipality is responsible for that harm." *See id.* (quoting *Epps v. Lauderdale Cnty.*, 45 F. App'x 332, 334 (6th Cir. 2002) (Cole, J., concurring)). "[W]hen the constitutional harm complained of relates to lack of action due to failure to train, the municipality may still be liable." *Id.* (citations omitted). So under binding precedent, even if neither Officer Sexton nor Officer Hunter committed a constitutional violation, Defendant could still be liable to Plaintiffs. *See id.* Therefore, this Court need not, and does not, decide whether either Officers Sexton or Hunter committed a constitutional violation. Instead, the Court analyzes the two theories of Defendant's liability that Plaintiffs may have defended at summary judgment: (1) official policy and (2) failure to train.

### A. Plaintiffs Failed To Identify An Illegal Official Policy That Deprived Mr. Burkhart Of A Constitutional Right.

Although it appears that Plaintiffs abandoned their official policy theory of liability in their Response in favor of their stronger failure to train theory, [*see* Doc. 47 at 14-15], for the avoidance of any doubt, Defendant is entitled to summary judgment on any official policy theory. To succeed under this theory, Plaintiffs "must identify the policy, connect the policy to the city itself and show

9

that the particular injury was incurred because of the execution of the policy." *See Jackson v. City of Cleveland*, 925 F.3d 793, 829 (6th Cir. 2019) (citation modified). This, Plaintiffs have not done. ***First***, they have not identified any specific illegal official policy [*See* Doc. 47 at 12-15]. ***Second***, even if a generic reference to Claiborne County Jail policies were enough, Plaintiffs failed to connect any specific Jail policy to Defendant Claiborne County [*See id.*]. And ***third***, Plaintiffs do not show that the injury to Mr. Burkhart happened because of the execution of a specific policy [*See id.*]. Even if Plaintiffs meant to rely on the Claiborne County Jail policies for assessing arrestees at intake, requesting a medical evaluation, and maintaining the arrestees' care, there is no showing that the policies themselves, rather than a failure to train on when to request medical evaluation, caused Mr. Burkhart's injury [*See* Docs. 35-3 at 5-8 (Claiborne County Jail Policies and Procedures at 1-2)]. Accordingly, to the extent Plaintiffs did not abandon an official policy theory of liability, Defendant is entitled to summary judgment on it.

      **B.**    **A Genuine Dispute Of Material Fact Exists Regarding Plaintiffs' Failure to Train Theory Of Liability.**

A "municipality's culpability for a deprivation of rights is at its most tenuous where a . . . claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To succeed on a Section 1983 failure to train theory, Plaintiffs must show that: (1) the relevant training Defendant provided was inadequate for the tasks performed; (2) the inadequacy was the result of Defendant's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury alleged. *See Howell v. NaphCare, Inc.*, 67 F.4th 302, 319 (6th Cir. 2023) (citation omitted). "There are two ways to support a claim that a failure to train" is the "result of a municipality's deliberate indifference." *Helphenstine*, 60 F.4th at 323. Plaintiffs only attempt to show one— "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential for a

10

constitutional violation." *Id.* (quoting *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 738-39 (6th Cir. 2015)). "This sort of claim is available only 'in a narrow range of circumstances,' where a federal rights violation 'may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations.'" *Id.* (quoting *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). Then, Plaintiffs must prove causation. *See id.*

Here, a genuine dispute over facts "that might affect the outcome" of the case precludes summary judgment on this theory. *See Regions Bank*, 67 F.4th at 802. As in *Helphenstine v. Lewis County*, viewing the facts in the light most favorable to Plaintiffs, there is a genuine dispute of material fact regarding whether Defendant adequately trained its correctional officers at the Jail to identify a medical emergency that might require medical attention. *See Helphenstine*, 60 F.4th at 324-25. Officers were not trained on identifying an overdose or "signs and symptoms of an overdose" [*See* Docs. 35-3 at 4 (Suttles Decl. ¶ 11), 47-8 at 9 (Suttles Dep. 30:23-31:7, 32:23-33:1)]. Nor were they trained on how to "determine whether or not someone was suffering from an opioid overdose" as "opposed to" simply "being intoxicated" [Doc. 47-2 at 12 (Hunter Dep. 43:1-4)]. A jury could infer that Defendant charged correctional officers with determining whether an arrestee required medical attention, "a requirement well outside their area of expertise," without providing sufficient training to meet the task. *See Helphenstine*, 60 F.4th at 325. Because correctional officers "were not trained on how to identify" a "medical emergency" regarding an overdose death but were charged with assessing when to request medical attention, a jury could reasonably conclude that the training provided was "insufficient." *See id.*

A jury question remains on deliberate indifference too. Again, as in *Helphenstine*, "[t]he inadequacy of the training . . . at the jail [could] demonstrate[] that it results from the County's deliberate indifference to the rights of its . . . [arrestees] because the possible unconstitutional

11

Case 3:22-cv-00358-KAC-JEM   Document 74   Filed 07/30/25   Page 11 of 12
PageID #: 711

consequences are patently obvious." *Id.*; *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). "Asking employees to use professional judgment that lies outside their area of expertise may demonstrate deliberate indifference." *See Helphenstine*, 60 F.4th at 325 (citation omitted).

And there is a genuine dispute of material fact regarding causation. The Parties do not dispute that Mr. Burkhart died of an overdose. Viewing the facts in the light most favorable to Plaintiffs, a jury could reasonably conclude that the failure to train correctional officers on how to identify the signs and symptoms of a drug overdose led to a failure to request earlier medical intervention for Mr. Burkhart and that earlier medical intervention would have prevented his death from an overdose. *See id.* at 326. On this record at this stage in the case, a reasonable jury could conclude that Mr. Burkhart's death resulted from Defendant's failure to train on signs and symptoms of a drug overdose. *See id.* Accordingly, the Court denies Defendant's Motion for Summary Judgment as it relates to Plaintiffs' failure to train theory.

## III. Conclusion

For the above reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendant Claiborne County, Tennessee's "Motion for Summary Judgment" [Doc. 35]. Plaintiffs' Section 1983 claim against Defendant proceeds only on the failure to train theory.[3]

SO ORDERED.

                                                                */s/ Katherine A. Crytzer*
                                                                KATHERINE A. CRYTZER
                                                                United States District Judge

---

[3] Plaintiffs listed "John Doe 1, in his individual capacity; and John Doe 2, in his individual capacity" as "Defendants" in the caption of their First Amended Complaint [*See* Doc. 33 at 1]. But the body of the First Amended Complaint does not identify either Doe as a party or include any claim against either Doe [*See id.* ¶¶ 6-9, 27-35]. Accordingly, the Court **ORDERS** the Clerk to terminate John Doe 1 and John Doe 2 as defendants on the Court's docket.